**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 10a0396n.06

**No. 08-5906**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| LONNIE DICKENS, | ) | **FILED**<br>**Jul 02, 2010**<br>LEONARD GREEN, Clerk |
| Plaintiff–Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| INTERSTATE BRANDS CORPORATION, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF TENNESSEE |
| Defendant–Appellee. | ) | |

Before:      MARTIN, BOGGS, and COLE, Circuit Judges.

PER CURIAM. Lonnie Dickens took something that didn't belong to him: a beverage cooler owned by his employer, Interstate Brands Corporation ("IBC"). When IBC found out, it fired him. Dickens sued, claiming that IBC's treatment of him in connection with the matter was racially discriminatory and a violation of federal law, and arguing that IBC's more lenient treatment of employees that had been similarly situated to him demonstrated that racial discrimination was their true motive in his case. A district court granted summary judgment to IBC, holding that the evidence Dickens had produced was insufficient to meet the prima facie case requirements for his Title VII employment-related race discrimination claim, and Dickens appealed. Because we agree with the district court that Dickens has provided no evidence that those employees he seeks to compare himself with were similarly situated to him, we hold that he has not met his prima facie burden and affirm the judgment of the district court.

08-5906
Dickens v. Interstate Brands Corp.

I

Lonnie Dickens, who is African-American, was hired by Interstate Brands Corporation in 1996 as a bread production worker in IBC's Memphis, Tennessee mass-production bakery. For at least some part of his employment, Dickens was supervised by Jerry Archer, who is white, in IBC's Bun Department. According to Dickens, at one point in approximately January 2004 he himself was suspected of "stealing time" by fraudulently punching in and out when he was not actually working, but an investigation of the matter revealed that Jerry Archer was the person responsible for punching Dickens in and out on a day that Dickens was not present at work.

At some point after this alleged incident, Dickens was transferred to another department and began working as a relief sanitation worker, a full-time position that required him to fill in for regularly-scheduled sanitation workers who were sick, on vacation, or otherwise unable to work their scheduled shifts.

On July 8, 2005, Dickens was one of approximately nine sanitation department employees who helped an IBC Safety Manager, Tara McLeane, unload safety awards from a truck trailer. As a gesture of appreciation for their help, McLeane arranged for lunch: pizza, delivered to one of the facility's conference rooms. Additionally, she arranged for two IBC-owned and -labeled coolers to be filled with ice and beverages, so that the employees who had helped her would have something to drink. Dickens asserts that McLeane had told another of the employees helping that morning, Michael McBride, that "you all can have the [coolers] that we're using." Because McLeane and McBride were walking at the time with Dickens and another of the helpers, Andrew Broome, Dickens claims that he understood her to mean that Dickens could have a cooler as well. During the

-2-

lunch, one of the employees went to get ice from one of the coolers and discovered that both coolers were missing. Upon hearing that the coolers were missing, McLeane asked the assembled group where the coolers were; when she did not get a response, she told them that no one was leaving until the coolers were found. Dickens then approached McLeane and told her that he had put one of the coolers in his car. Under the direction of McLeane, Dickens retrieved the cooler. The second cooler was likewise recovered from Broome's car.

McLeane reported the incident to Jason Brandt, IBC's Human Resources Assistant Manager, and Dickens was suspended pending an investigation. Brandt obtained written statements from each of the employees who were present at the time of the incident, including McLeane and McBride. None reported that McLeane had told Dickens and Broome that they could take the coolers, and neither McLeane nor McBride indicated that they had discussed the coolers at all.[1] On July 13, 2005, Dickens and Broome were terminated for theft of company property.

Dickens filed a grievance with his union, the Bakery, Confectionary, Tobacco Workers & Grain Millers, Local 149, the day after his dismissal. After investigating the merits of Dickens's complaint, the union declined to pursue the grievance. Dickens then filed a charge against the union with the National Labor Relations Board, which was dismissed; that dismissal was upheld on appeal to the NLRB Office of Appeals. On October 25, 2005, Dickens filed an EEOC charge against IBC alleging that his termination was discrimination on the basis of race.

---

[1]Andrew Broome, Michael McBride, and all of the other employees helping McLeane were African-American. The record does not appear to contain a reference to McLeane's race.

08-5906
Dickens v. Interstate Brands Corp.

The EEOC determined that it was unable to conclude that the information they had obtained established any violation of the relevant statutes, and issued Dickens a right-to-sue letter. Dickens then brought his claims in the district court. On IBC's motion for summary judgment, the district court held that Dickens had failed to make out a prima facie claim of race discrimination, because he could not demonstrate that similarly situated white employees had been treated differently in similar circumstances.[2]

This timely appeal followed.

II

This court reviews a district court's grant of summary judgment de novo. *Int'l Union v. Cummins, Inc.*, 434 F.3d 478, 483 (6th Cir. 2006). As such, we will uphold such a grant "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). If the moving party meets its burden to demonstrate the absence of a genuine issue of material fact, the non-moving party must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).

---

[2]Dickens's complaints before the EEOC and the district court also included allegations of sex discrimination and unlawful retaliation; however, these claims are not before us on appeal.

III

A

Title VII makes it an unlawful employment practice "to . . . discharge any individual . . . because of such individual's race [or] color . . . ."  42 U.S.C. § 2000e-2(a)(1).

When a plaintiff employee presents only circumstantial evidence that his discharge was motivated by race or color, we examine Title VII discrimination claims under the evidentiary framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under that framework, the plaintiff bears the initial burden of persuasion in establishing a prima facie case of discrimination by showing that (1) he is a member of a protected group, (2) he was subject to an adverse employment decision, (3) he was qualified for the position, and (4) he was either replaced by a person outside of the protected class or was treated differently than similarly situated non-protected employees. *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008).

B

Dickens has not presented any direct evidence of discrimination; we must therefore look to whether he can advance a prima facie case using circumstantial evidence under the *McDonnell Douglas* framework.  While neither party disputes that Dickens is a member of a protected group, was subject to an adverse employment decision, and was qualified for his position, Dickens has not demonstrated or alleged that he was replaced by a person outside of his protected class.  Therefore, the parties' dispute as to the presence of a prima facie case turns solely on whether Dickens was

treated differently than similarly situated employees—"comparators"—who were not in his protected class.

To establish that a non-protected employee is an appropriate comparator, "the plaintiff [must] demonstrate that he or she is similarly-situated to the non-protected employee in all *relevant* respects." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 353 (6th Cir. 1998). In the disciplinary context, we have held that this requires that the plaintiff and the proposed comparator have engaged in acts of "comparable seriousness." *Clayton v. Meijer, Inc.*, 281 F.3d 605, 611 (6th Cir. 2002). To make this assessment, we have looked to certain factors, such as whether the individuals "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Ercegovich*, 154 F.3d at 352 (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). However, when such factors are not relevant, we need not consider them. *Ibid.* Rather, to determine whether two individuals are similarly situated with regard to discipline, we "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the [proposed comparable] employee." *Ibid.*

With respect to his claims of race discrimination, Dickens has not pled any facts that a rational finder of fact could use to infer that Dickens's alleged comparators are similarly situated. The entirety of his discussion of these allegedly similarly situated comparators in his brief on appeal is two sentences:

Plaintiff's employment was terminated in what amounted to a misunderstanding over a cooler, when other white employees accused of punching employees in and out on the time clock and stealing money were not terminated. The decision to terminate plaintiff, when viewed in light of other more serious violations made by white employees, could not have been deemed anything but a pretext for discrimination.

In his response to Interstate Brands's motion for summary judgment, Dickens claimed at the district court only that "in January of 2004 he was investigated for having stolen time by making a false time clock punch and that the actual person responsible for doing so was his supervisor, Jerry Archer (Caucasian), who to his knowledge was not terminated as a result," and that "Jim Gatlin (Caucasian) was caught stealing money and not terminated." Dickens made no effort at the district court to establish that Archer or Gatlin were "similarly situated" to him, beyond the bare allegations that they, too, were accused of theft.

With respect to Jerry Archer, Dickens testified in his deposition that

A. They actually found out that Jerry [Archer] was the one who actually clocked me in and actually clocked me out.

[. . .]

Q. . . . And how did you find that out?

A. The supervisors were talking about it, that, you know, they looked at it and seen where the situation had came from.

It is unclear from Dickens's testimony who these "supervisors" were—Jerry Archer was himself a supervisor, and these could conceivably have been either Archer's own superiors or his co-supervisors. Under either scenario, however, Dickens's testimony fails to meet his evidentiary burden under the fourth element of the *McDonnell Douglas* prima facie case, because Jerry Archer was not "similarly situated" to Lonnie Dickens. There are several relevant differences between Dickens's

situation and the information he provides about Archer. Aside from the obvious difference under *Ercegovich* that they did not have the same supervisor, there is simply no indication in the record that Archer was subject to the same disciplinary standards as Dickens. Archer was a production supervisor, whereas Dickens was a relief sanitation worker. The two were neither in the same business unit nor on anything close to the same level of the company's hierarchy.

Additionally, Dickens does not plead—and nothing in the record suggests—that Archer's supposed infraction was found by the company to have been a deliberate attempt to steal company property. In Dickens's own situation, IBC conducted an investigation in which it interviewed and obtained statements from witnesses before it concluded that Dickens's taking of the company-owned cooler was intentional. In pointing to Archer as a comparator, however, Dickens apparently cannot claim that Archer was also determined to have "stolen time" deliberately—merely that he "was the one who actually clocked me in and clocked me out." The possibility of innocent mistake, ruled out by IBC's investigation in Dickens's situation, remains alive in Archer's even if we accept Dickens's pleading as gospel.

Even further, the nature of their supposed offenses is different. Whereas Dickens purloined a beverage cooler for his own benefit, Archer was, at worst, accused of stealing time on behalf of a subordinate. An employee who steals tangible company property for his own personal use is clearly committing an offense of a qualitatively different nature than one who, apparently unsolicited, clocks a subordinate in and out. The difference in the nature of their actions leads us to conclude that, for

*McDonnell Douglas* purposes, Archer and Dickens were not "similarly situated," and therefore we may not infer racial discrimination from the fact that Archer was treated differently.[3]

As to his other potential comparator, Dickens's allegations that any of the events concerning Jim Gatlin even occurred appear to be exclusively hearsay. Unlike his allegedly direct knowledge that "the supervisors" were discussing (and therefore knew of) Archer's time-clock misadventures, Dickens claims to have learned of Gatlin's supposed infraction from Randy Ring, who is described merely as a "guy that was actually in the same meeting" where Jim Gatlin was told that if he repaid the money he had taken Gatlin's supervisor "would take care of it." Randy Ring is not alleged to have been a supervisor or to have had any type of decision-making authority over Jim Gatlin; thus, his unsworn statements are being offered by Dickens purely for the truth of what they assert—even if we construe them only as asserting that Jim Gatlin's supervisor *believed* that a theft had occurred, and thus should have treated Gatlin as Dickens was treated—and are barred by the hearsay rule. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.").

Moreover, Jim Gatlin not only worked a different job than Dickens, for a different supervisor, but was also represented by a different union with a different set of contractual limitations on termination procedures. Additionally, there is no record as to the nature of Gatlin's supposed offense

---

[3]This is not to imply, of course, that a potential comparator must have committed the exact same offense to be considered "similarly situated." Rather, as noted above, the question is whether the offenses are of "comparable seriousness." Dickens has made no effort to show that IBC would have taken Archer's alleged offense with the same seriousness that it took Dickens's own otherwise-dissimilar transgression.

other than that he "stole money." Dickens has not alleged how much money Gatlin took, or under what circumstances, or any other information that might permit us to make a judgment as to what factors would be relevant to the "similarly situated" inquiry. In short, Dickens cannot prove that Gatlin even engaged in theft, much less that the theft was so similar to Dickens's own that we could permissibly draw an inference of racial discrimination from the fact that Dickens was fired while Gatlin was not.

## IV

Because the evidence Dickens presented to the district court cannot establish that he was treated differently than similarly situated others outside of his protected class, no genuine issue of material fact exists with respect to the fourth element of the prima facie case required by the *McDonnell Douglas* framework and judgment as a matter of law is appropriate for IBC. The judgment of the district court is **AFFIRMED**.